**MAX SOFTWARE, INC., Plaintiff,**

v.

**COMPUTER ASSOCIATES INTERNATIONAL, INC., Defendant.**

**No. CIV.A.05–RB–134 (BNB).**

United States District Court, D. Colorado.

April 11, 2005.

Steven Lee Heisdorffer, Godin & Baity, LLC, Denver, CO, for Plaintiff.

Jane Michaels, Kris A. Zumalt, Holland & Hart, LLP, Denver, CO, for Defendant.

## ORDER

BOLAND, United States Magistrate Judge.

This matter is before me on the defendant's **Motion to Vacate Scheduling Conference and Stay Proceedings Pending Disposition of Computer Associates' Motion to Dismiss and for Order Com-** pelling MAX Software to Initiate Arbitration (the "Motion to Stay"), filed March 8, 2005. I held a hearing on the Motion to Stay on April 6, 2005, and took the matter under advisement. The Motion to Stay is GRANTED.

This case arises out of a Distribution Agreement entered into between MAX Software LLC and Platinum technology, inc., on April 15, 1998. The Distribution Agreement granted Platinum the exclusive right to "(i) use, reproduce, and display and (ii) promote, license perpetually to End–Users, distribute, transmit and otherwise market, maintain and support" certain computer programs developed by MAX. First Amended Complaint ("Amend Comp."), Exh. 1 (the "Distribution Agreement") at ¶ 2(a). Platinum's rights under the Distribution Agreement were acquired by Computer Associates ("CA") in 1999. Amend. Comp., ¶¶ 4–5. The Distribution Agreement was negotiated by Platinum and MAX, Distribution Agreement at ¶ 25; CA played no part in its formation.

The Distribution Agreement includes an arbitration clause, which provides:

All disputes involving, arising out of or related to this Agreement shall be submitted to a panel of three arbitrators appointed and operating under the rules of the American Arbitration Association, and to the extent it is consistent with those rules, operating under the Uniform Arbitration Act. Each party shall appoint one arbitrator, and the arbitrators shall then appoint a neutral arbitrator. The location of the arbitration hearing will be chosen by the party not initiating the arbitration. The written decision of the arbitrators shall be final, binding, and convertible to a Court judgment in any appropriate jurisdiction.

Distribution Agreement, ¶ 24.

The Distribution Agreement also provides that it may be extended for an additional two year term, as follows:

On the condition that the aggregate payments made to Max hereunder, plus the last payment due Max during the Initial Term exceeds $2,200,000, then Platinum, at its option, may extend the term of this Agreement for an additional term of 2 years.

*Id.*, at ¶ 5(e).

On March 29, 2000, CA exercised its right, obtained through Platinum, to extend the Distribution Agreement. The letter containing the notice to extend states in relevant part:

Pursuant to Section 5(e) of the [Distribution] Agreement, on behalf of Platinum Technology, Inc. and Computer Associates International, Inc. we are hereby giving you notice that we are exercising our option to renew the [Distribution] Agreement for an additional two-year period as of April 1, 2000.

In addition to the foregoing renewal notice, the parties to the [Distribution] Agreement wish to clarify certain matters with respect thereto, and hereby agree as follows:

[The first three clarifications deal with (1) the amount of payments made under the Distribution Agreement, (2) credit balances existing and carried forward into the renewal term, and (3) the payment due under the last quarter of the initial term of the Distribution Agreement]

4. All other terms of the [Distribution] Agreement shall remain in full force and effect.

Amend. Comp., Exh. 2 at p. 1. Consequently, the arbitration provision of paragraph 24 was renewed with the rest of the Distribution Agreement.

Through its Amended Complaint, MAX asserts the following claims against CA:

(1) breach of contract; (2) pre-renewal fraud; (3) post-contract fraud; (4) copyright infringement; (5) misappropriation of trade secrets; (6) unfair competition; (7) and (8) RICO violations; (9) and (10) COCCA violations; (11) theft; (12) non-disclosure or concealment; (13) violation of the Colorado Consumer Protection Act; (14) negligent misrepresentation; (15) unjust enrichment; (16) breach of the implied covenant of good faith and fair dealing; (17) waiver of the right to arbitrate; and (18) fraudulent inducement of the arbitration clause and that the arbitration clause is unenforceable as against public policy.

In general, MAX complains that CA failed to pay MAX royalties which were due; failed to provide accurate royalty reports; failed to provide required documents, including license agreements; withheld information necessary for MAX to audit CA's records and refused to allow MAX to audit CA's records; failed to maintain the confidentiality of MAX's software and related documents; and reverse engineered MAX's product. *See, e.g.,* Amend. Comp. at ¶ 77. In addition, and with particular relevance to the issue of discovery related to the validity of the arbitration clause, MAX alleges:

CA engaged in systematic fraud designed to misrepresent and underpay royalties to MAX, and to cover-up CA's fraud against MAX and its broader fraudulent scheme, of which its fraud against MAX was a part.

\*       \*       \*       \*       \*       \*

One of CA's means of concealing its criminal schemes was to induce CA's victims, like MAX, to agree to private arbitrations. In that manner, CA was able to keep its schemes from public and judicial scrutiny. CA minimized discov-

ery and obstructed the truth-finding process, and was able to financially squeeze its opponents into settlement. Arbitration was an integral part of CA's schemes and CA's attempt to conceal them.

\*    \*    \*    \*    \*    \*

CA's use of arbitration, including the arbitration clause with MAX, was purposefully designed to further and did further CA's criminal schemes by at least the following:

a.  CA obstructed discovery of information that would have exposed its criminal schemes;

b.  CA used the secrecy of arbitration to conceal its criminal schemes from the public and government investigators;

c.  CA paid less in royalties then it knew it owed, relying on the fact that it could successfully obstruct discovery during arbitration and abuse the arbitration process by unfairly increasing the time and cost of arbitration to make it unlikely that a royalty recipient, like MAX, would demand arbitration in the first instance, and knowing the royalty recipient could not bear the cost imposed by CA's conduct once arbitration began.

Amend. Comp., ¶¶ 97, 281, and 285.

The issue before me is not the enforceability of the arbitration clause; rather, I am to decide whether to stay proceedings, including discovery, pending a determination of the arbitration issue by the district judge. MAX argues that it requires discovery "to determine whether, as asserted, the arbitration provision was fraudulently induced, whether it is unconscionable, whether it is against public policy, and whether CA has waived the provision. . . .

Discovery must proceed so that evidence can be presented to the jury on these issues." MAX's Response to Motion to Stay (the "Response"), filed March 28, 2005, at ¶ 1.

This issue was addressed by a federal trial court in *Arnold v. Arnold Corp.*, 668 F.Supp. 625 (N.D.Ohio 1987), *aff'd in part and vacated in part on other grounds*, 920 F.2d 1269 (6th Cir.1990), where the court held:

> [C]ourts must enforce agreements to arbitrate absent a well-founded claim that an arbitration agreement resulted from the sort of fraud or excessive economic power that would provide grounds for the revocation of any contract. . . .

> It is clear that fraud sufficient to override the strong policy in favor of enforcing arbitration clauses must relate to the procurement of the arbitration clause itself, and not to the agreement as a whole. The allegations [of fraud] clearly relate to an alleged fraud in the procurement of the arbitration clause. Thus the issue becomes whether the allegations . . . are sufficient to convince the Court to refuse to compel arbitration, or at a minimum sufficient to convince the Court to allow the plaintiff to conduct discovery with respect to the alleged fraud in the inducement of the arbitration clause.

*Id.* at 628 (internal citations and quotations omitted).

Here, as in the *Arnold* case, MAX has alleged no specific facts tending to show how CA sought or intended to "reap a benefit from the [arbitration] agreement over and above the normal benefit of such agreements in the event disputes arise from the terms of the agreement: limited, less burdensome, and less extensive dis-

covery than the wide-open discovery that is *de rigueur* in civil litigation taking place in state and federal courts alike." *Id.* In particular, the contention that the arbitration clause was inserted as a device to prevent MAX from obtaining adequate discovery does not constitute a well-supported or well-founded claim of fraud in the inducement of the agreement to arbitrate. *See Arnold v. Arnold Corp.—Printed Communications for Business,* 920 F.2d 1269, 1280 (6th Cir.1990).

MAX's allegations of fraud, unconscionability, and violation of public policy in connection with the arbitration clause at issue here amount to an unsubstantiated indictment of the arbitration system. According to MAX, any party that proposes or, as here, agrees to arbitration in a negotiated contract because that party believes arbitration may be preferable as a result of its less formal procedures and private nature has committed a fraud or induced an unconscionable agreement or violated public policy. MAX's argument is directly contrary to the strong federal policy favoring arbitration for dispute resolution. *Peterson v. Shearson/American Express, Inc.,* 849 F.2d 464, 465 (10th Cir.1988). Consequently, I decline to allow discovery on the issue of the enforceability of an arbitration clause where, as here, the alleged fraud, concealment, or other misconduct asserted to invalidate the arbitration clause is nothing more than the inherent characteristics which distinguish arbitration from a civil action, including circumscribed discovery and a private setting.[1]

Discovery on the issues of fraud in the inducement and concealment seems particularly unnecessary in this case where Platinum, not CA, negotiated the Distribution Agreement in the first instance, including the arbitration clause, and CA merely exercised its option to extend the existing agreement.

MAX also alleges that CA waived its rights to enforce the arbitration clause. In particular, MAX alleges:

> MAX's primary executive contact at CA regarding the Distribution Agreement was James Gilbert. Mr. Gilbert was CA's Senior Vice President of Finance. Mr. Gilbert was intimately familiar with the terms of the Distribution Agreement. Mr. Gilbert told Mick Trujillo, MAX's president, that CA would not arbitrate disputes under any circumstances.

Amend. Comp., ¶ 272. This allegation of the Amended Complaint is drawn from Mr. Trujillo's affidavit submitted in opposition to CA's initial motion to dismiss. In his affidavit, Mr. Trujillo stated that "Mr. Gilbert represented to me that CA would not arbitrate its disputes under any circumstances." MAX's Response to Computer Associates Motion to Dismiss and for Order Compelling MAX to Initiate Arbitration, filed March 14, 2005 (the "Response to First Motion to Dismiss"), Exh. 4 (the "Trujillo Aff.") at ¶ 5. Mr. Trujillo's affidavit fails to provide the context of the statement and, in particular, fails to speci-

---

1. In the arbitration of a dispute under the rules of the American Arbitration Association applicable here, discovery (including production of documents, interrogatories, and depositions) is permitted to the extent agreed to by the parties or as ordered by the arbitrator, "consistent with the expedited nature of arbitration." Motion to Stay, Exh. C at ¶ L–4. In addition, a court may vacate an arbitral award where the arbitrators "so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Thus, the arbitral forum is not one in which MAX will be denied the opportunity meaningfully to pursue its claims. *See Arnold,* 920 F.2d at 1279.

fy whether the statement was made in connection with discussions concerning CA's intentions with respect to the arbitration clause contained in the Distribution Agreement.

Also in support of its argument that CA waived its right to compel arbitration in connection with the Distribution Agreement, MAX asserts:

> When discussing **similar agreements** between CA and MAX, Mr. Gilbert wrote in an email dated March 7, 2003 to Mr. Trujillo and Joe Hassing, a MAX sales representative:

> "Historically, CA has not been satisfied with the arbitration process with the lack of appeal for unsatisfactory settlements. It is the position of the CA legal department that CA **will no longer enter into agreements** that require arbitration in lieu of due process through the court system."

Amend. Comp., ¶ 272 (emphasis added). This statement clearly does not relate to CA's position with respect to its right to arbitration under the Distribution Agreement. MAX acknowledges that this statement was made in connection with other agreements, and in fact it was made in connection with unrelated agreements being negotiated between CA and MAX in March of 2003. *See* Response to First Motion to Dismiss, Exh. 5 at p. 2.

Finally, MAX points to a second e-mail from CA representatives as supporting its argument that CA waived its arbitration rights under the Distribution Agreement:

> Likewise, Nigel Espley, was CA's Regional Vice President. He was aware of CA's Distribution Agreement with MAX. On Thursday, February 28, 2002, Mr. Espley wrote an email to Mr. Trujillo and CA's legal department which said:

> "We have a corporate policy against Arbitration."

Amend. Comp., ¶ 273. This second e-mail also concerns negotiations of a contract unrelated to the Distribution Agreement. *See* Response to First Motion to Dismiss, Exh. 6 at p. 2.

I fail to see how discovery at this point would produce facts and evidence, unknown or unavailable to MAX and relevant to the issue of the enforceability of this arbitration clause. Discovery concerning CA's conduct with respect to the negotiation or enforcement of arbitration clauses in other agreements is not relevant to, nor is it reasonably calculated to lead to the discovery of admissible evidence concerning, the issue of the enforceability of the arbitration clause contained in the Distribution Agreement.

IT IS ORDERED that the Motion to Stay is GRANTED. All disclosure and discovery is STAYED pending a ruling by the district judge on Computer Associates' Motion to Dismiss MAX's First Amended Complaint.